**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**


**GWENDOLYN LANGSTON,**

      **Plaintiff,**

**vs.**                          **Case No. 5:10cv161-RS/WCS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

      **Defendant.**

_____/


## REPORT AND RECOMMENDATION

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

Plaintiff, Gwendolyn Langston, applied for disability insurance benefits. Her last date of insured status for disability benefits was December 31, 2007. R. 17. Since Plaintiff had previously applied for benefits and been denied on March 30, 2004, the

Administrative Law Judge's decision considered the claim for the period from March 31, 2004, to December 31, 2007. R. 16-17.

Plaintiff did not attend the administrative hearing. R. 424. Her attorney, David E. Evans, attended the hearing but left the hearing after testimony from a medical expert and without telling the Administrative Law Judge that he planned to leave. R. 442-443.

Plaintiff alleges disability with onset on January 1, 2003, due to obesity, degenerative disc disease of the lumbar and cervical spine, degenerative arthritis of the right knee, status post rotator cuff repair, anxiety, depression, and borderline intellectual functioning. Plaintiff was born on September 1, 1953, was 49 years of age on January 1, 2003, completed the 8th grade in special education, and has past relevant work as a care-giver and nursing assistant. The Administrative Law Judge found that Plaintiff had the residual functional capacity to do a limited range of light work, can still do her past relevant work, and thus was not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).  The court must give "substantial deference to the Commissioner's decision."  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.' "  Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.	Is the individual currently engaged in substantial gainful activity?

2.	Does the individual have any severe impairments?

3.	Does the individual have any severe impairments that meet or
	equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.	Does the individual have any impairments which prevent past
	relevant work?

5.	Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Legal analysis**[1]

### Whether the ALJ erred in failing to evaluate Plaintiff's mental impairment pursuant to Listing 12.05 and by failing to order additional intellectual testing

Plaintiff contends that the ALJ should have evaluated her mental impairment pursuant to Listing 12.05 and should have ordered additional intellectual testing.  Doc. 15, p. 9.  Plaintiff notes that both consultative examiners, Drs. Warriner and Smith, found that she suffered from borderline intellectual functioning and had a "significant learning disability."  *Id.*, pp. 9-10.

On December 30, 2003, Plaintiff was evaluated by Clell C. Warriner, Ph.D., for her mental status.  R. 199.  Dr. Warriner reported that Plaintiff had only completed the eighth grade in special education classes and never received her GED.  *Id.*  She trained on-the-job for her work as a nursing assistant.  *Id.*

Plaintiff said that her physical problems included rotator cuff surgery on both shoulders, a bypass operation, and a low back injury.  *Id.*  She complained of herniated discs in her neck, pain in her shoulders, headaches two to three times a day, low back pain, pain in her hips and knees, and significant confusion, memory, and concentration

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >.  Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.    The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

problems.  *Id.*  She was five feet three inches tall and weighed 260 pounds.  *Id.*  Plaintiff

said that she could not do household chores or other activities of daily living due to

concentration problems, but she had not had any mental health treatment and Dr.

Warriner found this assertion to be difficult to assess.  *Id.*  Despite her complaint of

memory problems, Dr. Warriner said she could do serial threes slowly using her fingers,

and could remember two of three objects after ten minutes.  *Id.*  He found no evidence

of any major disabling mental health conditions.  *Id.*, pp. 199-200.  Dr. Warriner's

diagnosis was mild to moderate chronic pain disorder, apparent memory and

concentration problems, but no psychiatric diagnosis.  R. 200.  He assigned a GAF

(Global Assessment of Function) score of 65.[2]  *Id.*  He found Plaintiff capable of

handling funds with cooperation with her husband.  *Id.*

On March 11, 2004, Plaintiff returned to Dr. Warriner for "completion of

neuropsychological testing."  R. 197.  Dr. Warriner said that at this encounter, Plaintiff

shared more of her history.  *Id.*  Plaintiff said that she had had "extensive difficulty in

grade school, failing many courses repeatedly."  *Id.*  She said that "she could never

master anything past simple addition and subtraction, had difficulty reading and

comprehending, and . . . her CNA [certified nursing assistant] certificate was granted

before there was any formal testing required."  *Id.*  Based upon this history, Dr. Warriner

said that Plaintiff appeared to have "a long time learning disability and may have been

---

[2] Axis V of the DSM-IV Multiaxial System and the meaning of the GAF scores is explained at:  http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.  A GAF score of 61-70 indicates: "Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning (e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

Borderline retarded throughout her life." *Id.* He noted that she was only sent to her for neuropsychological screening, however. *Id.* Thus, he administered the Wechsler Memory Scale Third Edition test "to assess her memory functions." *Id.* With the exception of Plaintiff's visual delayed memory score (recalling details of pictures she had seen earlier), all of her scores were in the bottom 10% of the general population. *Id.* Dr. Warriner concluded that Plaintiff had "documented memory and concentration difficulties," in addition to mild to moderate chronic pain disorder. R. 198. He also concluded that Plaintiff was probably borderline in her intellectual capability. *Id.* He assigned a GAF rating of 54.[3] *Id.*

On August 25, 2006, Plaintiff was examined by David J. Smith, Ph.D., for a mental status evaluation. R. 245. Dr. Smith did not administer any tests. R. 245-247. He said that "records" indicated that Plaintiff alleged disability due to anxiety. R. 245. Dr. Smith conducted a clinical interview, reviewed the records, and made his evaluation. *Id.* He did no testing. *Id.* Dr. Smith said that Plaintiff's speech was pressured, over productive, and rambling, and she reported problems with concentration and short-term memory. *Id.* He thought that her verbal expression "suggested intellectual deficits." *Id.* He said her mood was anxious and depressed. *Id.* Her judgment appeared to be

---

[3] A GAF score of 51-60 indicates: "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers). *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

intact, but her insight was limited.  *Id.*  She was currently taking Zoloft[4] and Xanax[5] as prescribed by her family physician, but with little benefit from Zoloft and a "fair" response to Xanax.  R. 246.

Plaintiff said that she had worked as a nursing assistant at a nursing home for five years, that the job ended when she injured her shoulder, and she had not worked since then.  *Id.*  She said that her breathing problems and pain were severe barriers to activities of daily living.  *Id.*  She said that she became short of breath when she walks short distances, that her hip and foot become numb when she drives a motor vehicle, and she said that she can do only very light house cleaning.  *Id.*  She said she often cannot shop due to shoulder pain.  *Id.*

Plaintiff said she socializes infrequently and is uncomfortable with people other than family members and a few friends.  R. 246.  Dr. Smith said that it "was apparent during the interview that anxiety, frustration, and emotionality would impact social functioning."  *Id.*  He said she "presented as nervous, worried, labile, moody, and insecure."  *Id.*  He thought that she had moderate anxiety and depression.  *Id.*  He thought that anxiety, depression, and concentration problems "add to her difficulties with daily activities."  *Id.*  "Moodiness and anxiety are judged to be moderate barriers to social functioning."  R. 247.  He thought that Plaintiff was only marginally competent to manage her funds.  *Id.*  His diagnosis was moderate major depression, "single episode,"

---

[4] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

[5] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders. Anxiety associated with depression is also responsive to Xanax.  PDRhealth™, PHYSICIANS' DESKTOP REFERENCE.

and anxiety disorder, not otherwise specified. *Id*. He assigned a GAF score on Axis V of 60. *Id*.

The Administrative Law Judge did not determine that Plaintiff's intellectual functioning was a "severe" impairment at step 2 of the analysis. R. 19. He did find, however, that her anxiety and depression were "severe" impairments. *Id*. He then considered Plaintiff's mental impairments at step 3. *Id*. He found that Plaintiff's mental impairments caused only mild restriction of her activities of daily living. *Id*. The ALJ said that Plaintiff "displays some anxiety and insecurity around others" and thought that this would cause "moderate difficulty in social functioning." *Id*. Likewise, the ALJ concluded that Plaintiff had moderate difficulties with concentration, persistence and pace due to anxiety and depression. R. 20. He found that Plaintiff had not experienced an episode of decompensation. *Id*. Since Plaintiff did not have at least two "marked" limitations, he found that she did not meeting Listings 12.04 or 12.06. *Id*.

At step 4, the ALJ discussed the findings of Drs. Warriner and Smith. R. 24. He noted that Dr. Warriner thought that Plaintiff had borderline intellectual functioning, possibly due to a learning disability. *Id*. He noted that the first GAF score of 65 assigned by Dr. Warriner, indicated only mild impairment, but observed that the second score of 54, indicated moderate impairment. *Id*. He noted the GAF score of 60 assigned by Dr. Smith, which indicated a moderate to mild impairment. *Id*. He observed that Plaintiff had not sought mental health treatment, but had been treated with Zoloft and Xanax. *Id*. He concluded that Plaintiff has moderate impairment in social functioning and concentration, persistence, and pace, and he included those

limitations in his residual functional capacity determination.  R. 23-24.  The ALJ's analysis, therefore, apparently did not consider Plaintiff's intellectual functioning at steps 2 and 3, but at least mentioned the findings of Drs. Warriner and Smith concerning intellectual functioning at step 4.

At the administrative hearing, the ALJ asked the vocational expert to assume that Plaintiff had no limitations as to her ability to understand, remember, and carry out simple instructions, and to make judgments on simple work-related decisions.  R. 451. In addition to physical limitations identified by Dr. Hancock in earlier testimony (which will be discussed ahead), he assumed that Plaintiff had moderate limitations in her ability to carry out, remember, and perform semi-skilled work having an SVP of 3 or 4. *Id*.  He defined a moderate limitation as more than a slight limitation of function, but still able to perform the task satisfactorily.  *Id*.  He assumed that Plaintiff had moderate limitation of her ability to interact with members of the general public, co-workers, and supervisors, and to make adjustments in a routine work setting.  R. 451-452.  The vocational expert testified that within those limitations, Plaintiff could do her past relevant work as a companion as she performed it and as defined by the Dictionary of Occupational Titles, and as a nurse assistant, CNA, as she performed that job.  R. 452.

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."  Sims v. Apfel,  530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), citing Richardson v. Perales, 402 U.S. 389, 400-401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  "Because a hearing before an ALJ is not an adversary

proceeding, the ALJ has a *basic* obligation to develop a full and fair record." Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997) (emphasis added), *citing*, Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981).  This basic duty exists whether or not the claimant is represented.  Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995) (citation omitted).

Additional evidence, however, is not necessary if the record contains sufficient evidence to make a decision.  Wilson v. Apfel, 179 F.3d 1276, 1278 (11th Cir. 1999).  Further, ". . . there must be a showing of prejudice before we will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record."  Brown v. Shalala, 44 F.3d at 935  *Id.*  The court should be guided by "whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.' "  *Id.*; Graham v. Apfel,129 F.3d at 1423.

Plaintiff here has not shown evidentiary gasps resulting in unfairness or clear prejudice.  Listing 12.05 provides in part that a claimant will be found to be disabled if she had a valid verbal, performance, or full scale IQ of 59 or less, or any one of these IQ scores between 60 and 70 and either "a physical or other mental impairment imposing an additional and significant work-related limitation of function," or marked restrictions in two specified categories of activities.  Listing 12.05B, C, and D.  "Borderline intellectual functioning" is the next range of IQ scores, from 71 to 80.  Moore v. Astrue, 623 F.3d 599, 601 (8th Cir. 2010).  Thus, even if intelligence testing had

revealed that Plaintiff has borderline intellectual functioning, Listing 12.05 would not have been satisfied.

Even if there is error at step 2 in not finding that Plaintiff has the "severe" impairment of borderline intellectual functioning and a learning disability, a remand is not needed if error is harmless because the ALJ considered the limiting effects of the impairment at steps 4 and 5, along with other impairments. Riepen v. Commissioner of Social Sec., 198 Fed.Appx. 414, 415 (6th Cir. Oct 10, 2006) (not selected for publication in the Federal Reporter, No. 05-2407); Reed-Goss v. Astrue, 291 Fed.Appx. 100, 101 (9th Cir. Aug 25, 2008) (not selected for publication in the Federal Reporter, No. 07-35477); Newton v. Astrue, 2008 WL 915923, *10 (N.D. Ga. Apr 01, 2008) (No. CIV.A.1:06CV1542AJB). While the ALJ did not find at step 2 that Plaintiff has a "severe" impairment of borderline intellectual functioning and learning disability, he discussed the findings of Dr. Warriner and Dr. Smith at steps 4 and 5. He included their findings in the residual functional capacity determination posed to the vocational expert. Plaintiff had the basic intellectual ability to do her past relevant work and jobs like that, and this was substantial evidence in the record (when combined with the other evidence supportive of the residual functional capacity assessment) to determine that Plaintiff could still do the jobs identified by the vocational expert. The ALJ did not err in failing to send Plaintiff for another round of mental testing.

**Whether the ALJ properly evaluated Plaintiff's subjective pain testimony**

Plaintiff contends that the ALJ did not follow the Eleventh Circuit's guidance for evaluating Plaintiff's subjective complaints of pain and her ability to do work. Plaintiff did

not testify, so there was no testimony.  Elsewhere in the record, however, Plaintiff

alleged disability due to arthritis, a herniated disc, and osteoporosis.  R. 84.  She said

that the herniated disc in the back of her neck causes pain and affects her shoulders.

R. 98.  She said that she had arthritis of the right knee, with pain and stiffness when

standing and walking.  *Id.*  She said her weight make this worse, and affects her right

hip joint.  *Id.*  She said that standing, walking, and sitting for any length of time

aggravates these pains.  *Id.*  She said her pain medication (Lortab[6]) made her a little

drowsy.  *Id.*  She said that she does not clean her house, do yard work, or shop.  R. 99.

She said that after brushing her teeth, showering, and getting dressed, she must lie

down because she is out of breath.  R. 101.  She also said that she suffers from

shortness of breath when bathing and when walking to the mail box.  R. 102, 106.  She

said her husband fixes her meals before he leaves for work.  R. 103.  She said she

does not go outside unless she has an appointment, and is afraid to drive due

numbness in her legs.  R. 104.  She said she was able to pay bills, count change,

handle a savings account, but did not know how to fill out a check.  *Id.*  She said she

wants to be left alone.  R. 106.

    Pain and other symptoms reasonably attributed to a medically determinable

impairment are relevant evidence for determining residual functional capacity.  Social

Security Ruling 96-8p, p. 4.  Pain and other symptoms may affect either exertional or

non-exertional capacity, or both.  *Id.*, p. 6.

---

    [6] Lortab is one of the brand names for hydrocodone.  PHYSICIANS' DESK REFERENCE
(2004), p. 3233.  Hydrocodone is a semisynthetic narcotic derivative of codeine having
sedative and analgesic effects more powerful than those of codeine.  DORLAND'S
MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002). The reasons articulated by the ALJ for disregarding the claimant's subjective testimony must be based upon substantial evidence. Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991). It is not necessary that the ALJ expressly identify this circuit's standard if his findings "leave no doubt as to the appropriate result" under the law. Landry v. Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

On January 7, 2004, Plaintiff was examined on a consultative basis ("disability evaluation") by Asim Khattak, M.D. R. 192-194. She alleged impairment due to arthritis, osteoporosis, a herniated disc and ankylosis,[7] pain in her neck, bilateral shoulder and knee pain, right knee swelling, obesity, and anxiety. R. 192. Plaintiff said that she had chronic pain, was unable to pick up anything, and that her work tires her very easily. *Id.* She said she had had trauma at work in the past resulting in rotator cuff surgery for both shoulders. *Id.*

---

[7] Ankylosis is the immobility and consolidation of a joint due to disease, injury, or surgical procedure. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

Dr. Khattak said that a 1997 x-ray of Plaintiff's left hip revealed a single silver clip in her left sacroiliac joint, but no fracture. *Id.* A 1999 MRI of her right knee "revealed large effusions with [a] moderately large posterior medial popliteal cyst with intact menisci and posterior cruciate ligament with questionable integrity of the anterior cruciate ligament." *Id.* An MRI in 2000 of Plaintiff's lumbar spine revealed a "minimal lateral disc bulge on the left at [the] L5-S1 level without significant encroachment on the nerve root and a large extrusions of C6-C7 disc with only some minor evidence of degeneration." *Id.*

Plaintiff was then not working, and had formerly been a nursing assistant at a nursing home. R. 193. Dr. Khattak noted that Plaintiff had had anxiety and depression for many years. *Id.* She was 5 feet 3 inches and weighed 298 pounds. *Id.* Plaintiff's lungs were clear. *Id.* Dr. Khattak found it difficult to evaluate Plaintiff's joints because of her obesity, "particularly her hip and knee joints but apparently there is no swelling, erythema, crepitus, or deformity." R. 193-194. Dr. Khattak found Plaintiff to have mild paravertebral muscle spasms in her lower back, and a positive response to straight leg raising bilaterally at 35 degrees and in a sitting position. R. 194. He did note decreased range of motion in her cervical and lower spine. *Id.* Plaintiff's gait did not need any assistive device, and her grip strength and fine manipulations were grossly intact. *Id.* He found "no reproducible fatigue from repetitive muscle testing," but Plaintiff had complained of tiring after minimal exercise. *Id.*

On September 29, 2004, Plaintiff was seen by George Tracy, M.D., with complaints of leg pain. R. 351. She said she had had severe bilateral cramping in her

thighs.  *Id.*  She had no shortness of breath.  *Id.*  Her lower extremities had no obvious

edema, though it was noted that edema may have been difficult to detect due to her

obesity.  *Id.*  She had "good lower extremity strength."  *Id.*  His assessment was bilateral

leg pain, hypertension, and medication noncompliance.  *Id.*

On January 1, 2006, Plaintiff was seen by Huan Vu, M.D.  R. 336.  Plaintiff

described "vague symptoms" of feeling weak for one or two weeks, "especially when

she has to exert herself."  *Id.*  She complained of shortness of breath.  *Id.*  She had no

swelling, numbness, or weakness in her extremities.  *Id.*  Dr. Vu said that Plaintiff

"moves all extremities well with equal strength 5/5 bilaterally."  *Id.*  "She has no swelling,

erythema, or tenderness to any of her extremities."  *Id.*  Dr. Vu's diagnosis was

hypoventilation syndrome secondary to obesity.  *Id.*

On April 6, 2006, Hari Baddigam, M.D., examined Plaintiff for persistent dyspnea

and fatigue after an abnormal nuclear stress test.  R. 219.  Plaintiff's biggest complaint

was shortness of breath and fatigue.  *Id.*  Plaintiff had gained 25 to 30 pounds since the

preceding October and was "back up to over 300 pounds."  *Id.*  Dr. Baddigam noted that

Plaintiff was positive for arthritis, but negative for a limited range of motion.  *Id.*  He

noted from an echocardiogram on February 7, 2006, that Plaintiff's right atrium was

minimally dilated, and she had "minimal mitral insufficiency."  *Id.*  Dr. Baddigam advised

Plaintiff that he thought that the abnormal test results "might very well be due to her

body habitus and the likelihood of her having coronary artery disease are [sic] relatively

low."  *Id.*  His plan was to control symptoms of palpitations and blood pressure with a

beta blocker and he said that then she would "need to get up and get more activity and try to lose some weight." *Id.*

On May 8, 2006, Plaintiff returned to Dr. Baddigam. R. 218. She complained of "some numbness in her right leg." *Id.* She also complained of pain in her chest. *Id.* Dr. Baddigam prescribed a baby aspirin daily, and he thought that the pain might be coming from her liver. *Id.* He did not prescribe nitroglycerin because he did not think she was actually having cardiac chest pressure or pain. *Id.*

On September 19, 2006, Plaintiff was seen by Syed Gilani, M.D., for a disability evaluation. R. 248. Dr. Gilani said she complained of shortness of breath, but while giving the history, she was "sighing" but was not short of breath. *Id.* She complained of dyspnea on minimal activity and walking, and syncope and a "passing out feeling" on exertion. *Id.* She complained of numbness in her legs, and inability to walk "because she cannot feel her legs." *Id.* She reported that she cared for her personal hygiene, and did some housework, but her husband did the cooking. *Id.* She did not use an assistive device. *Id.* Dr. Gilani thought that Plaintiff's walking difficulties were caused by her obesity. R. 249. He did not find her to be in any acute distress. *Id.* He found her speech to be normal and her memory to be intact. *Id.* She could move her upper and lower extremities "without any problem," and had normal tone, power, and reflexes in both extremities. *Id.* She had no peripheral edema. *Id.* She had subjective tenderness in her cervical spine, but without paraspinal muscle spasms. *Id.* Straight leg raising was positive in both a sitting and a lying position for both lower extremities at 40 degrees. *Id.* Her range of motion was limited in both shoulders, and she could not

elevate her arms beyond 80 degrees. *Id.* She could ambulate without any problem or an assistive device. *Id.* Repetitive motions of her hands were normal. *Id.* She could not bend forward due to obesity. *Id.* Dr. Gilani thought that Plaintiff's experience of chronic shortness of breath and limitation of physical activity seemed to be "mostly related to her obesity." *Id.*

On August 31, 2007, Plaintiff had an MRI of her lumbar spine. R. 384. At the L1-2 level, there was evidence of disc dehydration, with mild disc bulging and hyperostosis,[8] but without herniated nucleus pulposus (HNP)[9] or significant central stenosis.[10] *Id.* At the L3-4 level, there was mild spinal stenosis due to an annular disc bulge and hypertrophic change, including facet arthropathy.[11] *Id.* At L4-5 and L5-S1, there was disc dehydration, without HNP or stenosis, but with facet arthropathy. *Id.* The diagnosis was multi-level degenerative change, with disc bulges as described, and spinal stenosis and facet arthropathy as noted. *Id.*

On November 15, 2007, Karin S. Maddox, M.D., performed a nerve conduction study of Plaintiff's lower extremities. R. 411. The results were normal. *Id.* She also performed electromyography of the muscles of the lower extremity. *Id.* She noted an

---

[8] Hyperostosis is an excessive growth or thickening of bone tissue. MEDLINE PLUS (MERRIAM-WEBSTER).

[9] A herniated nucleus pulposus is a slipped disk along the spinal cord. The condition occurs when all or part of the soft center of a spinal disk is forced through a weakened part of the disk. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[10] Stenosis is an abnormal narrowing of a duct or canal. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

[11] Arthropathy is a disease of a joint. MEDLINE PLUS (MERRIAM-WEBSTER).

"abnormal EMG indicative of posterior primary rami nerve root irritation," and suggested clinical correlation. *Id.* An MRI on November 14, 2007, by Emily Billingsley, M.D., reported normal alignment of the hip joints, but evidence of a tendon tear or tendinopathy at the hamstring. R. 414-415. An MRI of the right knee on the same date showed "tricompartmental changes of osteoarthritis in the right knee joint." R. 417. She said that there were "complex degenerative type tears in the anterior horn of both the medial and lateral menisci consistent with this patient's degree of osteoarthritis." *Id.* The posterior cruciate ligament was intact, but a normal anterior cruciate ligament was not identified. *Id.* There was "no edema to suggest an acute ACL disruption." *Id.*

Charles Hancock, M.D., testified at the hearing as to his opinion regarding Plaintiff's physical limitations. R. 425. Dr. Hancock is a retired board certified orthopedic surgeon. R. 425-426.

Dr. Hancock reviewed the medical records in this record. R. 426. He said that there was medical evidence that Plaintiff had arthritis of the knee, but she was too large for a DEXA scan, and thus there was no medical evidence to support her claim of osteoporosis. R. 427-428.

Dr. Hancock found evidence of a "large herniation of the C6-7 cervical disc but it doesn't point out whether or not she has nerve root compression or foraminal stenosis . . . ." R. 428. He said this herniation was "ample support" for her assertion that she suffers neck pain. *Id.*

Dr. Hancock said that although Plaintiff had had surgery in both shoulders and complained of shoulder pain, an examining physician had found "full range of motion in

the shoulders," and the shoulder motion was "within normal limits." *Id.* He concluded

that her complaint of shoulder pain was "not supported well." *Id.*

Dr. Hancock noted that Plaintiff complained of bilateral knee pain, but he could

"only find support for a problem with the right knee where she had swelling, [a] large

popliteal cyst and complex tears of the medial and lateral meniscus." *Id.* He noted that

she was 307 pounds and was 63 1/2 inches, and was "beyond the listing limit for

obesity," and would have met the former Listing for obesity. R. 429. She had had a

gastric bypass but had gained the weight back. *Id.* He observed that one physician

said that most of her problems are related to her obesity. *Id.*

Dr. Hancock found evidence of granulomatous disease of the lungs. *Id.* There

was no evidence of respiratory failure, congestive heart failure, or other chronic

respiratory problems. *Id.*

He noted from the records that Plaintiff could ambulate and did not need an

assistive device. *Id.* Plaintiff had normal repetitive movement of her hands, and had no

motor or sensory deficits. *Id.* He noted that nerve conduction studies were normal,

although a test of her cervical region was not done. R. 431. He did note that there was

some evidence of the irritation of the nerve root and posterior rami in the paralumbar

muscles. *Id.*

Dr. Hancock noted a residual functional capacity (RFC) assessment that Plaintiff

could do light work, that is, she could stand and walk six hours and was not limited in

pushing and pulling. R. 429. He said that this RFC would not be supported were it not

for Plaintiff's cervical disc herniation, and, therefore, he agreed with the light work

assessment. R. 430. He believed that Plaintiff could not work from heights due to her size. *Id.* He thought she had limitations for kneeling on her right knee, and had to avoid excessive heat, humidity, odors, and fumes due to her respiratory condition. *Id.* He thought that Plaintiff should avoid vibrations due to her herniated cervical disc. *Id.*

Dr. Hancock looked at the radiology report of Plaintiff's right knee and said that it was possible that the anterior cruciate ligament did not show up because it was partially or completely torn, but he thought that this was probably an old injury as Plaintiff did not have "joint effusion or edema along the expected course of the fibers of the anterior cruciate to suggest an acute injury." R. 433. He explained that someone with this might experience knee instability. *Id.* He explained that the anterior cruciate ligament:

> prevents the shin bone or the tibia from sliding forward on the femoral condyles when the knee is flexed and if the knee is flexed as in going downstairs if she led with the right leg, the right leg and down and then stepped on to that the femoral condyle would have a tendency to shift with respect to the tibial plateau and if the cruciate is not there it may happen.

R. 433. He said he had taken this right knee instability into account when he determined Plaintiff's residual functional capacity. R. 434.

Dr. Hancock noted that there was evidence of positive straight leg raising testing at 40 degrees bilaterally in the seated and in the supine positions. R. 436. He explained that the test may be positive on one side, but not on both. *Id.* He said that if there is a disc or some other object that compresses or pinches the sciatic nerve, then stretching that nerve between 15 and 70 degrees by leg raising causes pain. *Id.* He said that one would not expect pain from leg raising on both sides unless there was "a very large extrusion of the disc that crosses the midline and impales roots on both

sides," but he found no evidence of that kind of injury for Plaintiff.  R. 437.  He thought

perhaps the tester was not fully aware of how the straight leg raising test was to be

conducted.  R. 436.

Dr. Hancock noted that an MRI of Plaintiff's lower back revealed that Plaintiff "at

L3-4 . . . [had] mild spinal stenosis due to an annular disc bulge and hypertrophic

change including facet arthropathy."  R. 437.  Dr. Hancock said that "stenosis . . .

supposedly gives you non-radicular-type pain like what's called claudication which is

more like a vascular deprivation to the nerve."  *Id*.  He then said that "it says at L4-5

region there's disc dehydration without herniated nucleus pulposus or significant

stenosis and there is moderate facet arthropathy and those are the things that I marked

going through this were those two areas that were most consistent with what I would

like to think she would, you would find."  R. 437-438.

The Administrative Law Judge discussed the findings and analysis of Dr.

Hancock and essentially adopted those findings as his own.  R. 22-23.  As can be seen,

Dr. Hancock thoroughly and accurately discussed all of the evidence.  Dr. Hancock's

conclusions and analysis constitute substantial evidence in the record to support the

ALJ's residual functional capacity determination.  Thus, the ALJ's determination that

Plaintiff's subjective complaints were not credible to the degree alleged correctly

followed the Eleventh Circuit's pain standard and is supported by substantial evidence

in the record.

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law. The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on March 15, 2011.

s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.
UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.